**Frank S. SINKWICH, Individually and Frank S. Sinkwich, Inc., d/b/a Southern Oil Company, Inc., Plaintiffs,**

v.

**TEXACO REFINING & MARKETING, INC., Defendant.**

**Civ. A. No. 86–59–ATH (WDO).**

United States District Court,
M.D. Georgia,
Athens Division.

June 28, 1989.

Thomas B. Murphy, Bremen, Ga., and Gregg R. Potvin, Washington, D.C., for plaintiffs.

Robert C. Norman, Jr., Macon, Ga., and Mark D. Litvack, White Plains, N.Y., for defendant.

### ORDER

OWENS, Chief Judge.

On December 23, 1987, this court denied defendant Texaco Refining & Marketing, Inc.'s ("Texaco") motion for summary judgment on a Sherman Act antitrust claim brought by Frank S. Sinkwich both individually and doing business as Southern Oil Company, Inc. (hereinafter collectively referred to as "Southern"). Extensive discovery ensued. Upon reviewing the voluminous files, including newly submitted depositions, affidavits and other pleadings,

and at the urging of defendant, this court allowed defendant Texaco to renew its motion for summary judgment. Defendant has done so, and plaintiff has responded. Seeing that the matter is ripe for decision, the court now issues the following order.

### Findings of Fact

1. Defendant Texaco is a corporation engaged throughout the United States in refining, distributing and selling petroleum products, including the sale of motor fuels. Texaco sells and distributes motor fuels throughout the State of Georgia. *See* Defendant's Proposed Findings of Fact and Conclusions of Law ("Defendant's Proposed Findings"), ¶ 1.

2. From 1972 until sometime in 1978, plaintiff Southern, an organization based in Athens, Georgia, was a consignee of Texaco products, owning certain equipment and delivering Texaco products to various end users and retail customers on a commission basis. *See* November 5–6, 1986, Deposition of Frank S. Sinkwich ("November Sinkwich Deposition"), pp. 117–19; Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Plaintiff's Proposed Findings"), ¶ 4. Beginning in 1978 and continuing throughout the period relevant to this lawsuit, plaintiff Southern has been, pursuant to a series of Texaco S–175A marketer agreements,[1] a distributor/marketer of Texaco petroleum products.[2] *See* November Sinkwich deposition, pp. 10–11.

3. Plaintiff purchased Texaco's bulk storage facilities at Athens Commerce Park when it converted from consignee to marketer. Plaintiff's contention that it was required to purchase those facilities at Athens Commerce Park as a prerequisite to its designation as a Texaco distributor/marketer is not supported by the record.[3] *See* November Sinkwich Deposition, pp. 112–18. Generally, consignee agents of Texaco purchased Texaco's bulk storage facilities as part of the conversion to marketer. *See* Deposition of Carey Joseph McHugh ("McHugh Deposition"), p. 88. However, Texaco did not have an immutable policy requiring such purchase as a condition precedent to its consignees becoming marketers. *See* Deposition of G. Dale Lemmon ("Lemmon Deposition"), p. 20; McHugh Deposition, pp. 77, 88. Frank Sinkwich stated that Texaco at no time required Southern to store gasoline at the bulk storage facilities. *See* November Sinkwich Deposition, p. 115.

4. From the inception of its marketer relationship with Texaco, plaintiff Southern has focused upon and has primarily supplied petroleum products to those gasoline stations classified as "full service" as opposed to self-service stations, and the majority of those stations, both the full service stations and the few self-service stations, are situated in the rural areas and communities surrounding Athens, Georgia. *See generally id.* at 163–228. Of plaintiff's retail outlets, approximately ten (10) are connected with convenience stores. *See* December 20, 1988, Deposition of Frank S. Sinkwich ("December Sinkwich Deposition"), p. 230. While some of the stations supplied by Southern are in the City of Athens proper, the majority of Southern's clients or customers do business in or

---

1. *See* Plaintiff's Deposition Exhibit No. 1, attached to November 20, 1986, Deposition of Ronald B. Livesay; Plaintiff's Exhibit No. 1, attached to Deposition of Joseph Carey McHugh. "Marketer" is the term currently employed in the petroleum industry that reflects the merging of old-time distributors and retailers. A marketer generally performs a combination of some of the functions once performed exclusively by either a distributor or a retailer.

2. Pursuant to other agreements, including but not limited to Texaco S–175B agreements, plaintiff Southern distributes/markets other Texaco petroleum products. *See* November Sinkwich Deposition, p. 104.

3. Plaintiff relies in part upon an affidavit sworn to by Richard L. Shope and filed in a case brought in the United States District Court for the District of Maryland. Without ruling upon the relevancy, credibility or admissibility of that affidavit, this court notes that such affidavit has been read and that its references to bulk storage facilities stop far short of stating that defendant Texaco imposes upon its distributors a requirement to own such facilities. The court also notes that the affiant does not purport to have any knowledge regarding any comments made to or requirements imposed upon plaintiff Southern by defendant Texaco. *See* Rule 602 of the Federal Rules of Evidence.

around small Georgia communities such as Danielsville, Watkinsville, Talmo, Commerce, Center, Comer, Jefferson, Winder, Pendergrass, Gillsville, Colbert and Hoschton. *Id.* Most of Southern's customers are unable to accept direct delivery of full tanker truck loads of gasoline either for financial reasons or for reasons related to on-site storage capabilities. *See* December Sinkwich Deposition, pp. 31–35, 69–71; November Sinkwich Deposition, pp. 260–263. Thus, Southern routinely purchases tanker loads of gasoline, stores such gasoline at its storage facilities at Athens Commerce Park for varying periods of time and reloads delivery vehicles with gasoline when one of its customers needs fuel. *See* December Sinkwich Deposition, pp. 34–35; November Sinkwich Deposition, pp. 258–264; November 10, 1986, Deposition of Anthony W. Mattox ("November Mattox Deposition"), pp. 29–31.

5. Frank Sinkwich establishes the price for which plaintiff Southern's products will be sold to Southern's customers by mandating a certain profit margin. That profit margin remains steady at seven and one-half cents per gallon. *See* November Mattox Deposition, pp. 19–21; December Sinkwich Deposition, pp. 179–180.

6. Though the focus of plaintiff Southern's business has remained the "sparsely populated small town areas" and the primarily full service gasoline stations and convenience stores therein, the gasoline industry, both in the marketing and the retail aspects, has gravitated away from full service stations and has moved toward an emphasis upon self-service stations,[4] many of which are connected with and operated by convenience store chains. *See* Plaintiff's Proposed Findings, ¶ 7, 9; Defendant's Proposed Findings, ¶ 5, 7. The industry has evolved "from the old, tradition-

al distributor, jobber, wholesaler and retailer to a system I like to refer to as chain retailers." Lemmon Deposition, pp. 23–24. Coinciding with the movement away from the traditional distribution chain and the traditional full service gasoline and automobile repair station is a movement toward the installation of large storage tanks on the self-service gasoline station/convenience store site, tanks sufficiently large to warrant the delivery of full tanker truck loads of gasoline directly to the convenience store station. This system of direct delivery obviates the need for the traditional distributor. Concommitant with the elimination of the distributor follows significant reductions in costs. Convenience stores which possess sufficiently large storage are able to purchase gasoline for resale at a price less expensive than that price available to another retailer which must purchase smaller quantities of gasoline from and through a distributor, a distributor that prior to delivery had stored the gasoline in a bulk storage facility. Upon ultimate delivery to its customers, then, a distributor such as Southern had handled the product more than once. *See* Deposition of Raymond L. Viers ("Viers Deposition"), pp. 55–64; Deposition of Willard W. Oglesby ("Oglesby Deposition"), pp. 9–10; March 10, 1987, Deposition of Anthony W. Mattox ("March Mattox Deposition"), pp. 18–27;[5] November Sinkwich Deposition, pp. 115–116, 259–263.

7. In the formative years of this evolving market, convenience store chains purchased and retailed "independent gasoline," that is, gasoline not refined by and sold under the name of the major brands such as Texaco, Amoco, Chevron, etc. *See* Viers Deposition, p. 46. As time passed, many of the chains made arrangements with distributors/marketers to purchase

---

4. Self service gasoline stations were authorized for operation in Georgia by legislation enacted in 1971. *See* Georgia Laws 1971, pp. 683–684, §§ 1–3; O.C.G.A. § 36–60–1.

5. Mr. Viers is president and one of two equal shareholders in Vi–Mac, Inc., a gasoline distributorship business based in Stone Mountain, Georgia. He has been involved in the operation of this business since approximately 1967. *See*

Viers Deposition, pp. 7–17. Mr. Oglesby presently operates an Amoco gasoline distributorship in the Athens, Georgia area. He has been involved in the petroleum industry since 1961. *See* Oglesby Deposition, p. 9. Mr. Mattox has been employed by plaintiff Southern since 1977. Since 1984, he has served as office manager of plaintiff Southern. *See* March Mattox Deposition, pp. 3–4.

and to retail branded gasoline. Still later, many of the chains achieved designations as distributors/marketers; they purchased gasoline directly from the refinery of a major petroleum company like Texaco and had the fuel delivered by common carrier or company-owned tanker to their various stations. *Id.; see* McHugh Deposition, pp. 120–124; Lemmon Deposition, pp. 24–28. In addition to the involvement of retailers in the distribution aspect of the industry, many of the traditional distributors/marketers have become integrated marketers, that is, they have expanded beyond the role of merely transporting petroleum products and have become involved in the ownership and/or operation of convenience stores/gasoline stations. *See* Lemmon Deposition, pp. 4–26; Viers Deposition, p. 56. In contrast to this phenomena, plaintiff Southern "has not become an integrated marketer." Plaintiff's Proposed Findings, ¶ 8. Plaintiff not only has resisted this industry-wide trend toward integration, but also has failed to pursue vigorously the gasoline business of existing convenience store chains.[6] Defendant Texaco, on the other hand, has as a matter of company policy vigorously sought out relationships with convenience store chains. *See* McHugh Deposition, p. 121; Lemmon Deposition, p. 24; Viers Deposition, pp. 46–48.

8. Due to the loss in the spring of 1984 of a wholesaler headquartered in Gainesville, Georgia, defendant Texaco engaged in a search for some "quality-type distribution in the northeast Georgia area." McHugh Deposition, pp. 70, 85. Mr. McHugh, an area manager whose supervisory duties for wholesale distribution included northeast Georgia and Athens, identified three targets for such "quality type distribution." *Id.* at 5–7, 70–73. These targets included Clipper Petroleum, Country Cupboard and Golden Pantry Food Stores, Inc. ("Golden Pantry"). *See id.* at 70–71; March 18, 1988, Deposition of Michael Andrew Bald ("March Bald Deposition:), pp. 109–10. Plaintiff Southern was not seriously considered as a prospect for this increased representation due to discussions between Mr. Sinkwich and Mr. Bald, a marketing representative for Texaco, in which Mr. Sinkwich indicated an absence of interest in developing new retail outlets and/or other large investments at this advanced stage in his life and career. *See* March Bald Deposition, p. 108; *see also* November Sinkwich Deposition, pp. 204–205 and *supra* note 6. Discussions held with both Clipper Petroleum and Country Cupboard failed to lead to a business relationship with defendant Texaco. *See* March Bald Deposition, pp. 109–111. Discussions with Golden Pantry, in the person of President and Chief Executive Officer Mr. Calvin T. Griffith,[7] were more fruitful, eventually leading to a relationship between Texaco and Century Petroleum Products, Inc. ("Century"), an organization which has as its four stockholders the four sons of Mr. Calvin T. Griffith.

9. After same discussion with Texaco personnel, "Tom Griffith indicated that the Golden Pantry [organization] itself was not interested in becoming a Texaco marketer but that a company owned by his sons would be interested in becoming a Texaco marketer and that the customers of that company, called Century Petroleum, would be Golden Pantry retail outlets." March Bald Deposition, p. 113. Mr. Griffith stated as follows:

"As I remember, they [Texaco personnel] came to us with the request that we move Texaco product in our stores; and

---

6. *See* November Sinkwich Deposition, pp. 204–205, where Mr. Sinkwich stated that he decided sometime in 1983 or 1984 to sell his business and that, based upon such decision, any major investments in convenience stores and self-service gasoline stations "would have been kind of foolish." The court notes that early in Mr. Sinkwich's career as a consignee for Texaco, he called upon Mr. Calvin T. Griffith, an officer of *Golden Pantry Food Stores, Inc.*, in an unsuccessful effort to obtain a portion of that chain's

business. *See* December Sinkwich Deposition, pp. 205, 233.

7. Mr. Griffith has been President and Chief Executive Officer of Golden Pantry since 1970. Golden Pantry is based in Athens, Georgia and it operates eighty-two convenience food stores in northeast Georgia and in the southwestern portions of North and South Carolina.

as they came to me, I recommended that they do business with Century Petroleum or Century Marketing. It was our [Golden Pantry's] philosophy that we did not or was (sic) not in the jobber business,[8] and I really saw it as an opportunity for my sons to start a business."

April 9, 1987, Deposition of Calvin T. Griffith ("Griffith–Golden Pantry Deposition"), pp. 15, 29–30. (footnote added).

10. Century Petroleum Products, Inc., was incorporated on June 6, 1984. The four stockholders of Century include Michael Griffith, Brian Griffith, Steve Griffith and Chris Griffith. Century "was an opportunity for myself [Michael Griffith] and my three brothers to get into an independent business away from what we are presently in, being that ... Golden Pantry is not a family organization.... It would give us an opportunity down the road to go forward, develop, become independent business persons." Griffith–Century Deposition, p. 16.[9] One of the specific purposes for the incorporation of Century was to develop a marketer relationship with defendant Texaco. *Id.* at 17. Pursuant to the standard S–175A marketer agreement executed by Texaco and Southern, Century became a marketer for Texaco in August of 1984. *See* Exhibit C, p. 3, attached to plaintiff's memorandum in opposition to defendant's motion for summary judgment (Docket No. 60); Defendant's Proposed Findings, ¶ 15.

11. During Texaco's negotiations with Golden Pantry and/or Century, the status of Southern Oil was mentioned. Mr. Bald stated that Carey McHugh "indicated to Mr. [Calvin] Griffith that Frank Sinkwich was a Texaco wholesaler and that we [Texaco] had no intention of terminating his agreement." March Bald Deposition, p. 113. Michael Griffith stated in his deposition that neither the existence of Southern Oil nor the possible existence of two Texaco wholesalers in Athens, Georgia was a factor in Century's determination to obtain marketer status. *See* Griffith–Century Deposition, p. 42. That Texaco might sanction more than one marketer in an area the size of the Athens market was not a unique decision. Texaco has more than one marketer in both Dalton, Georgia and Smyrna, Georgia. *See* McHugh Deposition, pp. 24–25.

12. Texaco marketers serve numerous functions. Generally, the marketer develops its own network of distribution. Marketers take title to the product at the rack (terminal or refinery), and they have responsibility for that product in transit.

> The marketer is responsible for lead testing in unleaded products at the accounts he distributes to. The marketer is responsible for the implementation of the travel card S–452 agreement with the accounts that he allows to use the Texaco imprinter. The marketer is responsible for credit that he chooses to extend to other accounts. The marketer is responsible for brand integrity of the accounts that he delivers product to. The marketer is responsible for trademark infringement at the accounts he delivers product to.

McHugh Deposition, pp. 42–45. Storage capability is not a required function of Texaco marketers. *Id.* at 73. Generally, marketers are also responsible for maintaining Texaco's System 2000 "image" program in those retail accounts to which they deliver product. "If it was a marketer delivered

---

**8.** Golden Pantry owns one Texaco jobbership (marketer franchise). The franchise located in Aiken, South Carolina was purchased on April 29, 1985, as part of a larger transaction involving Golden Pantry's acquisition of twelve convenience stores under the name of Pump–N–Shop. At the insistence of the sellers, Golden Pantry was required to purchase the marketer franchise to acquire the stores. *See* Griffith–Golden Pantry Deposition, pp. 7–9; April 9, 1987, Deposition of Michael Griffith ("Griffith–Century Deposition"), pp. 34–35; Affidavit of Michael W. Griffith, attached to defendant Texaco's Motion for Summary Judgment.

**9.** Michael Griffith, though a stockholder of Century and one of its officers, is not involved in the daily operation of that concern. *See* Griffith–Century Deposition, p. 10. In addition to his ownership interest in Century, Michael Griffith is Vice–President of Engineering of petroleum operations for Golden Pantry. Michael Griffith purchases gasoline from various distributors and re-prices such gasoline for its resale at the eighty-two Golden Pantry stores. *Id.* at 4–5.

account we obviously go to the marketer, because that would be his responsibility in his relationship to the account he delivers to maintain our image standard." *Id.* at 60. If the economics of the situation preclude a retail outlet from investing in its facilities to achieve compliance with the System 2000 program, "if it was a marketer account[,] then we would ask the marketer to bring it up to our standards, to our system 2000 standard." *Id.* at 62.

13. However, those retail outlets which have developed a "clearly delineated image that set it apart as a particular type facility" might be permitted by Texaco to meet the image requirements only on the gasoline aspect of the facility, meaning the gasoline island area. *Id.* at 66. *See generally,* Lemmon Deposition, pp. 94–124. Golden Pantry, due to its investment in developing its own distinctive image, was excepted from the comprehensive System 2000 requirements. *See* March Bald Deposition, pp. 192–193. Golden Pantry was permitted to maintain its distinctive color scheme with the exception of the gasoline islands, which were painted to conform with Texaco's image program. *See* March Bald Deposition, p. 222.

14. The vast majority of Century's customers are Golden Pantry retail outlets. *See* Griffith–Century Deposition, pp. 18–20, and Plaintiff's Exhibit No. 1 attached thereto. All of Century's customers have on site storage facilities which enables Century to deliver gasoline directly to the gasoline station. Thus, Century does not perform some of the traditional distributor functions such as storing gasoline at a bulk storage facility and delivering smaller truck loads of product upon demand. *Id.* at 20.

15. Golden Pantry sells the following brands of gasoline to the motoring public: Chevron, Exxon, Shell, Amoco, Phillips, Gulf and Texaco. Golden Pantry also sells some unbranded gasoline. Griffith–Century Deposition, p. 7. The gasoline, branded and otherwise, is purchased in arms-length transactions from various distributors and marketers. *Id.* at 7–11. As the vice-president responsible for purchasing such gasoline from the various distributors and marketers, Michael Griffith is involved actively in negotiating the price Golden Pantry pays for the gasoline which it sells. *See id.* at 21–40. Golden Pantry generally pays from eight-tenths of one cent to one and one-half cents above the "rack price" [10] for the motor fuel it purchases from a distributor/marketer for resale; in addition, Golden Pantry pays to the distributor/marketer some negotiated transportation costs. *Id.* at 22–23. Golden Pantry pays Century "rack price plus a penny in (sic) freight." [11] *Id.* at 33 (footnote added). This arrangement is consistent with the arrangement Golden Pantry has with other distributors/marketers.

16. As stated previously, Golden Pantry operates eighty-two convenience stores/gasoline stations in Georgia, North Carolina and South Carolina. *See supra* note 8. The number of stations which sell a particular brand of gasoline are as follows: Amoco—Twenty-three (23) stations; Gulf—twenty (20) stations; Texaco—nineteen (19) stations; Phillips—five (5) stations; Shell—two (2) stations; Exxon—one (1) station; and Chevron—one (1) station. Eleven of Golden Pantry's facilities sell unbranded gasoline. *See* Griffith–Golden Pantry Deposition, pp. 17–18. Of the nineteen stations purveying Texaco gasoline, fourteen or fifteen are supplied with fuel by Century. *Id.* at 18; *see* Plaintiff's Deposition Exhibit No. 1, attached to Griffith–Century Deposition. "[W]ithin the Athens market, as arbitrarily defined as extending out 35 miles radially, ... there are 12 branded Gulf Golden Pantry C– stores, 11

---

**10.** "Rack price" is that price for which fuel is sold at the refiner's terminal. Griffith–Century Deposition, pp. 21–22.

**11.** In what is clearly an erroneous transcription, Michael Griffith's deposition reads as stated above. However, on pages 37–38 of his deposition, the matter is clarified. In a question, counsel for plaintiff states to Michael Griffith that "you are going to pay them [Century] rack [price] plus a penny plus the common carrier freight." In response, Michael Griffith answers "the rack price plus freight and a penny. That's our deal." The word "in" included in the text above should have read "and."

Amoco, five Texaco, three unbranded, and two Shell...." Griffith–Golden Pantry Deposition, pp. 19–20.[12]

17. Throughout the course of this litigation, plaintiff and defendant alike have referred to the relevant geographic market as a circular area extending radially thirty to thirty-five miles from Athens, Georgia. *See* Griffith–Century Deposition, pp. 8–9 (plaintiff's counsel restricts Michael Griffith's answers to a market area of "Athens, and arbitrarily a radial distance of, say, 30 to 35 miles."); McHugh Deposition, pp. 20–22; Griffith–Golden Pantry Deposition, pp. 18–20; February 4, 1987, Deposition of David R. Kamershen, Ph.D. ("1987 Kamershen Deposition"), pp. 29–30 (initial opinion regarding geographic market is roughly 30 to 40 miles from Southern's bulk plant); February 9, 1988, Deposition of David R. Kamershen, Ph.D. ("1988 Kamershen Deposition"), pp. 46–47. The relevant product market is motor fuel, or more specifically, gasoline. Dr. Kamershen, plaintiff's expert witness, has conducted little, if any, examination of Texaco's share of the relevant product market in the relevant geographic market, and he has stated that he has no opinion as to such share. *See* 1988 Kamershen Deposition, pp. 50–51.

18. Beginning on page 163 of Mr. Sinkwich's November Deposition, he identifies and discusses Southern's customers. *See generally*, November Sinkwich Deposition, pp. 163–228; *see also* December Sinkwich Deposition, p. 156. In almost every case,

Mr. Sinkwich explains the background and nature of those businesses and their status. Many of Southern's customers are ongoing enterprises; some have changed owners or lessees, and some others have moved, closed or for other reasons ceased to be Southern's customers. During the discussion, Mr. Sinkwich identified several of Southern's customers which allegedly have been affected by Golden Pantry's provision of Texaco gasoline to the motoring public pursuant to its arrangement with Century. These allegedly injured customers, and their relative proximity to competing Golden Pantry stations selling Texaco products,[13] include the following: Keith Adams (3–4 miles); Main Street Texaco (7–8 miles); Center Grocery (4–5 miles); Chase Street Texaco (3–4 miles);[14] Jack's Service Station (2 blocks); Logan's Texaco (3–4 miles); and Smith's Texaco (10–12 miles). Most of the above-identified stations are full service stations, selling gasoline and repairing automobiles in repair "bays." These stations as a general rule compete not only with Golden Pantry stations selling Texaco gasoline but also with retailers, including Golden Pantry, selling other brands of gasoline. *Id.* In answering questions propounded by defense counsel regarding the volume of each of these customers, Mr. Sinkwich was unable to offer an opinion as to the damage, if any, caused to these customers by the Texaco branding of Golden Pantry stores.[15]

---

**12.** The statement included above was made by plaintiff's counsel, and it summed up the testimony of Calvin T. Griffith. Mr. Griffith responded "[t]hat's correct" to the statement made by plaintiff's counsel.

**13.** Plaintiff's pleadings make clear that Texaco's granting of a Texaco marketer franchise to Century which in turn makes Texaco gasoline available to the motoring public through Golden Pantry retail outlets is the conduct which allegedly affects competition. This focus upon intrabrand competition (Texaco v. Texaco) as opposed to interbrand competition (Texaco v. Gulf, Amoco or Exxon) is evidenced by Mr. Sinkwich's concern with credit card sales. *See* November Sinkwich Deposition, p. 167. Plaintiff contends that motorists intending to pay with Texaco credit cards drive several miles to Golden Pantry Texaco stores rather than purchase gasoline at Texaco outlets supplied by

plaintiff Southern because gasoline can be purchased at a cheaper price at the Golden Pantry outlets.

**14.** Mr. Sinkwich has stated that the Chase Street Texaco went out of business not due to competition from Golden Pantry but due to poor management. *See* December Sinkwich Deposition, p. 168.

**15.** Of course, this court is aware that Mr. Sinkwich is not an expert in economics. His statements regarding the effect upon competition are noted for the purposes of completeness rather than for their probative value. Dr. Kamershen has included in a report attached to his 1988 deposition an opinion of some of Southern's damages. Much of Dr. Kamershen's opinion focuses upon alleged price discrimination, an issue which this court has considered and rejected. *See Southern Oil Co., Inc. v. Texaco Refin-*

19. Frank Sinkwich decided sometime in 1983 or 1984 to sell his business. December Sinkwich Deposition, p. 204. Approximately six or seven prospects have discussed, directly or indirectly, the purchase of plaintiff Southern with Mr. Sinkwich. *Id.* at 218; *see* November Sinkwich Deposition, p. 246 (discussions with four or five prospective buyers). Mr. Sinkwich identified Bob Hughes, Danny Hill, Al Jackson and one individual whose name he could not recall as prospective purchasers of Southern. However, Sinkwich does not contend that defendant Texaco had any influence upon the failure of those discussions to result in an agreement. *Id.* at 246–48.

20. At one point, Charlie Upchurch,[16] a real estate broker, arranged certain discussions involving Mr. Sinkwich and Calvin T. Griffith regarding Golden Pantry's possible interest in purchasing Southern. Whether Mr. Griffith or Mr. Sinkwich requested these discussions is not clear; however, the discussions failed to result in an agreement for the sale of Southern. *See* Griffith–Golden Pantry deposition, pp. 12–13; November Sinkwich Deposition, pp. 90–94; *see also,* Findings of Fact No. 9, *supra.*

21. Discussions with two other individuals proved more fruitful. Raymond L. Viers is a principal of Vi–Mac, Inc., a Texaco distributor/marketer based in the metropolitan Atlanta, Georgia area. *See* Deposition of Raymond L. Viers ("Viers Deposition"), pp. 7, 12–14. Sometime in the fall of 1983, Mr. Viers entered into discussions with Frank Sinkwich regarding Vi–Mac's possible interest in purchasing Southern. Viers Deposition, pp. 78, 98. Eventually, a price of $735,000.00 was quoted by the parties.[17] *Id.* at 99, 119–24; *see* Defendant's Exhibit No. 3, attached to Viers Deposition. Vi–Mac's purchase of plaintiff Southern was never consummated.

Time passed as Mr. Sinkwich considered the $735,000.00 price. Then, Mr. Viers heard of the possible enfranchisement of a second distributor/marketer in the Athens, Georgia area. Mr. Viers inquired of Texaco regarding the above rumor. Mr. Viers learned that, indeed, a second marketer was imminent in the area. About this same time, he received permission from Texaco to purchase plaintiff Southern.[18] Viers Deposition, pp. 124–130, and Defendant's Exhibit Nos. 4 and 5 attached thereto.

Upon discovering that Texaco had authorized a second marketer in the Athens area and upon hearing that Golden Pantry was in some way involved in this new marketership, Mr. Viers and Mr. Sinkwich arranged a meeting with Calvin Griffith. Mr. Griffith identified Century Petroleum as the distributor involved. Mr. Viers recalled that Mr. Griffith informed Viers and Sinkwich of Century's plans to distribute only to Golden Pantry outlets. *Id.* at 132–39. This information convinced Mr. Viers that the $735,000.00 price for plaintiff Southern was too high. *Id.* at 132–33. Thus, Mr. Viers lowered the offer to $645,000.00. This offer was not accepted. *Id.* at 143–49.

22. Sometime after negotiations involving Vi–Mac and plaintiff Southern ceased, Mr. Sinkwich entered into negotiations with

---

*ing & Marketing, Inc.,* Civil Action No. 86–59–ATH (WDO) (unpublished opinion) (M.D.Ga. Dec. 23, 1987). Therein, the court granted defendant Texaco's motion for summary judgment on plaintiff's allegations of a violation of the Robinson–Patman Act. Thus, Dr. Kamershen's opinion has little relevance to the issues still present in this litigation. Furthermore, in that opinion, Dr. Kamershan has failed to establish any measure of damages to plaintiff Southern's business or to competition in general which has resulted from Century's receipt of a Texaco marketer franchise.

16. Neither party has deposed Mr. Upchurch.

17. Mr. Viers could not recall whether the quoted figure was Vi–Mac's offer or Southern's price. *Id.* at 99. Later in his deposition, however, Mr. Viers stated that Vi–Mac made the $735,000.00 offer to Mr. Sinkwich. *Id.* at 124.

18. Mr. Viers acknowledged in his deposition that the August 10, 1984, date noted on Defendant's Exhibit No. 3, the $735,000.00 offer, contradicts to some degree some of his testimony. However, on page 132 of his *testimony,* he reiterated that the $735,000.00 offer was Vi–Mac's initial offer; that is, the offer made prior to Mr. Viers' knowledge of a second marketer. For purposes of explanation, the court notes that the sale or transfer of a marketer franchise required Texaco's approval.

Mr. Ronald B. Livesay of Colbert, Georgia. *See* November 20, 1986, Deposition of Ronald B. Livesay ("November Livesay Deposition"), pp. 48–51. Following a series of meetings, Mr. Sinkwich and Mr. Livesay agreed on a price of $500,000.00 for the purchase of Southern. *Id.* at 57. Mr. Livesay planned to purchase Southern through L & M Trucking, a company which he owned. *Id.* at 78. Following discussions involving certain Texaco personnel, Mr. Livesay decided not to pursue the proposed purchase of Southern.[19] *Id.* at 105, 118–19.

23. None of the involved individuals employed by Texaco, Golden Pantry or Century Petroleum has any knowledge of an agreement, scheme or plan undertaken by Texaco in conjunction with some other individual or entity which had as its purpose some goal violative of the antitrust laws, that is, a purpose to injure or damage the business of plaintiff Southern or to prevent plaintiff Southern from being purchased by Mr. Viers or Mr. Livesay or anyone else. *See e.g.,* March Bald Deposition, pp. 156–168; Griffith–Golden Pantry Deposition, pp. 44–45. Frank Sinkwich, in responding to questions from defendant Texaco's counsel, indicated that he had no evidence of and knew of no information about any alleged conspiracy between Texaco and Golden Pantry. The basis of Mr. Sinkwich's contentions of a conspiracy revolve about his inability to consummate a sales contract with Ronald Livesay. *See* November Sinkwich Deposition, pp. 156–158.

### Conclusions of Law

1. Title 15, U.S.C. § 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." In spite of the broad statutory language, this provision is "intended to prohibit only unreasonable restraints of trade." *Business Electronics v. Sharp Electronics,* 485 U.S. 717, ——, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808, 816 (1988), and cases cited therein. Generally, then, allegations of concerted action in violation of section one of the Sherman Act are examined pursuant to the "rule of reason." *See Business Electronics,* 485 U.S. at ——, 108 S.Ct. at 1519, 99 L.Ed.2d at 816; *National Bancard Corp. (NaBanco) v. Visa U.S.A.,* 779 F.2d 592, 596–97 (11th Cir.1986). Application of the rule of reason analysis requires an examination into the anticompetitive effect of the conduct in question upon the relevant product and geographic markets. *See Palmer v. BRG of Georgia Inc.,* 874 F.2d 1417, 1424 (11th Cir.1989). "Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation." *Business Electronics,* 485 U.S. at ——, 108 S.Ct. at 1519, 99 L.Ed.2d at 816.

2. "[P]er se rules are appropriate only for 'conduct that is manifestly anticompetitive,' that is, conduct 'that would always or almost always tend to restrict competition and decrease output.'" *Id.* at ——, 108 S.Ct. at 1519, 99 L.Ed.2d at 816, citing *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568, 580 (1977); and *Northwest Wholesale Stationers, Inc. v. Pacific Sta-*

---

**19.** Mr. Livesay explained in his deposition that Michael Bald related Texaco's willingness to approve the sale of plaintiff Southern's diesel fuel business to Mr. Livesay but was unwilling to approve at that time the sale of plaintiff Southern's gasoline business to Mr. Livesay. *Id.* at 99. Upon being so informed, Mr. Livesay determined not to pursue the purchase. *Id.* at 105. Michael Bald does not recall making such an offer to Mr. Livesay. *See* April Bald Deposition, pp. 29–33. Michael Bald recalls that Livesay's proposed purchase of plaintiff Southern collapsed due to problems with the credit information provided to Texaco by Mr. Livesay. *Id.* at 36–45. Mr. George O. Hawcroft, Jr., an employee of Texaco in the credit department, had in-

formed Mr. Bald "that credit approval could not be given for the proposed transferee based upon the financial information provided.... This application for credit approval remained open pending the receipt of possible additional financial information concerning the proposed transferee, but such additional information was never received by the Credit Department." Affidavit of George O. Hawcroft, Jr., pp. 1–2, attached to defendant Texaco's Motion for Summary Judgment. Mr. Sinkwich, to whom the request for additional credit information was made, never so advised Mr. Livesay. Livesay Deposition, p. 130. Mr. Livesay's credit has never been disapproved by Texaco. *Id.* at 129.

tionery & Printing Co., 472 U.S. 284, 289–90, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202, 208 (1985); and quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1, 16 (1979) (other citations omitted). Included among those arrangements which have been held to be *per se* illegal are the following:

> price fixing, *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); market and customer allocation, *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); boycott and concerted refusal to deal, *Fashion Originators' Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); and unreasonable joint venture, *Citizens Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).

*Palmer*, 874 F.2d at 1424. The above examples are generally considered to fall within that category of restraint known as "horizontal."

3. Generally, while vertical agreements establishing resale prices are illegal *per se*, see *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), vertical nonprice restraints are examined pursuant to the rule of reason analysis. *See Business Electronics*, 485 U.S. at ——, 108 S.Ct. at 1519–20, 99 L.Ed.2d at 816–17. Vertical nonprice restraints have not been found to have so deleterious an effect on competition and to be so lacking in redeeming value as to justify the application of the *per se* rule of illegality. *See id.* at ——, 108 S.Ct. at 1519–20, 99 L.Ed.2d at 817 (citations omitted). Rather, such restraints have "real potential to stimulate interbrand competition, 'the primary concern of antitrust law.'" *Id.* at ——, 108 S.Ct. at 1519, 99 L.Ed.2d at 817, quoting *Continental T.V., Inc.*, 433 U.S. at 52, n. 19, 97 S.Ct. at 2558, n. 19, 53 L.Ed.2d at 581, n. 19. Additionally, a rule of *per se* illegality is not needed or effective to protect intrabrand competition. *See Business Electronics*, 485 U.S.

at ——, 108 S.Ct. at 1519–20, 99 L.Ed.2d at 817.

4. Plaintiff in this case contends that Texaco's refusal to approve immediately the sale of plaintiff Southern to Ronald Livesay, in conjunction with Texaco's discussions with Golden Pantry and the ultimate designation of Century as a marketer, constitutes a refusal to deal. Plaintiff further contends that the effects of such refusal are felt horizontally; thus, plaintiff contends that this court should examine the conduct in question under the *per se* rule of illegality. Plaintiff cites *Malley–Duff & Associates, Inc. v. Crown Life Insurance Co.*, 734 F.2d 133 (3rd Cir. 1984), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984).

This court determines that *Malley–Duff & Associates* does not govern the case *sub judice*. In *Malley–Duff & Associates*, the Third Circuit noted that the alleged agreement in question was one "among insurance sellers—Lloyd, Craig, and Agency Holding, all competitors of Malley–Duff in the insurance sales business—*who conspired among themselves,* and indirectly assisted by Crown Life, to freeze their competitive seller out of the Crown Life insurance market; an agreement that produced an impact on the horizontal level." *Id.* at 141 (emphasis added). From reading the quoted language, this court finds it obvious that the Third Circuit considered the agreement among the three named individuals or entities a horizontal agreement, that is, one among competitors. As such, the panel's decision that the case should have proceeded to the jury on a theory of group boycott appears to follow traditional antitrust law. Plaintiff in the case before this court has produced no evidence of any agreement among plaintiff Southern's competitors. Instead, plaintiff contends that the alleged conspiracy involving Texaco and some other individual and/or entity at a different level of distribution is subject to *per se* analysis because of its alleged horizontal effects.

The Supreme Court in *Business Electronics* has laid to rest any argument that the focus of a court's examination in this

regard should be upon the "effects" of an agreement rather than upon the participants so agreeing. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Electronics*, 485 U.S. at ——, 108 S.Ct. at 1522–23, 99 L.Ed.2d at 820 (footnote omitted). In footnote 4, the Supreme Court expressly addressed the argument made now by plaintiff.

> The dissent apparently believes that whether a restraint is horizontal depends upon whether its anticompetitive effects are horizontal, and not whether it is the product of a horizontal agreement.... That is of course a conceivable way of talking, but if it were the language of antitrust analysis there would be no such thing as an unlawful vertical restraint, since all anticompetitive effects are by definition horizontal effects.... [A] restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement.

*Id.* at ——, n. 4, 108 S.Ct. at 1523, n. 4, 99 L.Ed.2d at 820–21, n. 4.

Finally, this court notes that defendant Texaco did not in fact "refuse to deal" with plaintiff Southern and Mr. Livesay. The deposition and affidavit testimony establishes beyond peradventure that Texaco was willing to consider Mr. Livesay as a purchaser of plaintiff Southern dependant upon the provision by him of certain information. While the channels of communication appear to have been less then clear, Mr. Livesay stated definitively that it was he who ultimately decided not to pursue the proposed purchase. Texaco did not "disapprove" Mr. Livesay.

Based upon the above, this court determines that the conduct alleged in this case is not of the type which is subject to analysis pursuant to the *per se* rules. Instead, the rule of reason analysis applies. *See generally*, Note, *The Sherman Antitrust Act and Vertical Restraints in the Wake of Business Electronics Corporation*, 23 Ga.L.Rev. 509 (1989).

5. To survive defendant Texaco's motion for summary judgment, plaintiff Southern must establish that there exists a genuine issue of material fact as to whether Texaco entered into an illegal conspiracy with either Golden Pantry or Century Petroleum, or some or all of the principals thereof, which caused plaintiff Southern to suffer a cognizable injury. "This showing has two components: first, [plaintiffs] must show more than a conspiracy in violation of the antitrust laws existed; they must show an injury to them resulting from the illegal conduct; second, the issue of fact must be material." *Palmer*, 874 F.2d at 1422, citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538, 552 (1986); and Fed.R. Civ.P. 56(c), (e). To carry its burden under Rule 56(c), plaintiff must go beyond merely creating some metaphysical doubt as to the material facts. Instead, plaintiff "must come forward with specific facts demonstrating a genuine issue for trial. Rule 56(e). Where the record, taken as a whole, does not lead a rational trier of fact to find for the [plaintiff], no genuine issue for trial exists." *Palmer*, 874 F.2d at 1422, citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552; and *Dunnivant v. Bi–State Auto Parts*, 851 F.2d 1575, 1579–80 (11th Cir.1988).

While the inferences which permissibly may be drawn from the underlying facts must be viewed in the light most favorable to the non-movant, "antitrust law limits the range of permissible inferences from ambiguous evidence in a Sherman Act section 1 case." *Palmer*, 874 F.2d at 1422; *see Dunnivant*, 851 F.2d at 1580. "Mere complaints of illegal conspiracy that are equally consistent with permissible competition, without more, do not support even an inference of conspiracy." *Dunnivant*, 851 F.2d at 1579, citing *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775, 785, *reh'g denied*, 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984); *see also Helicopter Support Systems v. Hughes Helicopter*, 818 F.2d 1530, 1533 (11th Cir.1987). "There must be direct or circumstantial

evidence that reasonably tends to prove that the [parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Dunnivant*, 851 F.2d at 1579 (quotation marks omitted, brackets in original), citing *Monsanto Co.*, 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed.2d at 786 (other citations omitted). Plaintiff "must demonstrate that the inference of conspiracy is reasonable in light of the competing inference of independent action or collusive action that could not have harmed" it. *Palmer*, 874 F.2d at 1422, citing *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357, 89 L.Ed.2d at 553; and *Dunnivant*, 851 F.2d at 1579–80. Plaintiff must produce evidence that tends to exclude the possibility that Texaco and its alleged co-conspirators were acting independently. *Monsanto Co.*, 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed.2d at 785. Further, "if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d at 552.

■ 6. In this case, plaintiff has failed to satisfy the initial element explained above; plaintiff has produced no evidence from which a reasonable inference could be drawn that a conspiracy existed. The voluminous and undisputed evidence establishes that Frank Sinkwich, the primary owner of plaintiff Southern, decided as far back as 1983 or 1984 that he desired to sell his business and that any further investment in such business was a foolish waste of time and money. That decision, and Texaco's knowledge thereof, virtually eliminated Southern as a candidate for expanded distribution responsibility. The undisputed evidence further establishes that defendant Texaco lost a distributor/marketer in the northeast Georgia area and that it began a search for a quality-type distributor in that area. In line with its corporate policy and

the national trend in the petroleum industry, defendant Texaco sought a relationship with one of three large convenience store chains. Having failed to arrange a relationship with any of the three targets identified by Mr. McHugh, Texaco considered Mr. Calvin Griffith's suggestion that Texaco enfranchise Century Petroleum. Ultimately, Texaco signed a marketer agreement with Century. This arrangement brought substantial business to Texaco, and it created additional interbrand competition in the northeast Georgia area. That Texaco's relationship with Century originated in discussions held between Texaco and Golden Pantry does not create an inference of an illegal conspiracy. Texaco's desire to acquire a share of Golden Pantry's business was a rational, independent business decision; Golden Pantry's stated corporate desire to remain as uninvolved as possible in the gasoline distribution business was an independent business decision. The nepotism evidenced by Mr. Calvin Griffith's actions may be a cause of concern for Golden Pantry Food Stores, Inc., but it is not a violation of the antitrust laws.

Plaintiff simply has produced no evidence which tends to establish that Texaco entered into any agreement with any entity or any individual which had as its goal or purpose the elimination of plaintiff Southern Oil as a marketer in northeast Georgia. Such a goal makes no "economic sense." No evidence indicates a desire on Texaco's part to cease doing business with Southern or the small country gasoline stations which Southern serviced.[20] A contrary inference arises from both the evidence and common sense—Texaco sought *to expand* its presence to include large, highly visible convenience store chains; Texaco had neither a desire nor an incentive to eliminate the second, distinct clientele represented by the smaller, less visible country stores.

In summary, this court concludes, after an extensive and painstaking study of the record, that plaintiff has produced no evi-

---

20. The depositions of Frank Sinkwich and Michael Bald make clear that they had a disagreement about Southern's efforts to upgrade certain of Southern's clients. However, no evidence creates an inference that, because of this dispute, Texaco sought to eliminate either Southern or the stations in question. If Texaco did harbor such a desire, then it seems to this court that Texaco would have leaped at the opportunity to replace Mr. Sinkwich with Mr. Livesay with the hope that Mr. Livesay would have invested in upgrading those stations.

dence which reasonably tends to prove that the parties had a conscious commitment to a common scheme designed to achieve an unlawful objective. Texaco acted independently in seeking out the business of a large convenience store chain. The decision to enfranchise Century, after approval of its credit, as the vehicle for obtaining a portion of Golden Pantry's gasoline business was a rational business decision which had nothing to do with plaintiff Southern and evidenced no desire to eliminate Southern or its clientele. All of the evidence is at least as consistent with permissible competition as it is with an illegal conspiracy.

7. Finally, the court notes that, assuming *arguendo* that plaintiff had adduced evidence from which a reasonable inference of an illegal conspiracy could be drawn, plaintiff has failed to produce evidence which supports a finding that Texaco's conduct caused a cognizable injury. Mr. Sinkwich identified a variety of reasons why the stations he services have failed or have lost some portion of their business. These reasons range from poor management to insufficient storage capabilities. Plaintiff's expert has produced figures which are inconclusive at best and unsubstantiated at worst. *See supra* note 15. In truth, for better or for worse, the petroleum industry and the motoring public have moved beyond the type of stations serviced by plaintiff. The antitrust laws were neither designed to slow nor have they been interpreted in such a manner as to impede the natural evolution of an industry.

8. Based upon the above discussion, this court hereby GRANTS defendant Texaco's motion for summary judgment.[21]

SO ORDERED.

---

**21.** Plaintiff's counsel argued that this court's prior order denying defendant's motion for summary judgment precluded the court from reconsidering defendant's renewed motion to that effect. Thus, plaintiff's counsel filed his responses "under protest." The court notes that the development of this case illuminated many allegations that were initially "vague" and brought forth numerous additional facts. As such, this court is certain that a consideration of defendant's renewed motion was proper. Additionally, the court notes that despite Mr. Potvin's "protest," he has diligently pursued his client's interests in this matter. Plaintiff Southern has suffered no prejudice as a result of the court's decision to permit Texaco to renew its motion.